IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA    )
                                    )     No. 3-13-00065
v.                              )
                                    )
JOSHUA LEE ALAN EICHEL    )

O R D E R

By order entered March 22, 2013 (Docket Entry No. 20), the government's motion for detention (Docket Entry No. 6) was granted, and the defendant was detained pending trial or other resolution of this case. As provided in the March 22, 2013, order, the Court found that, based on the defendant's criminal history and the evidence of his subsequent drug trafficking, there were no conditions of release that could be imposed that would reasonably assure that the defendant would not be a danger to the community.

The following constitutes the Court's findings that serve to supplement the basis of the Court's decision.

The defendant, age 32, was initially charged in a criminal complaint with conspiracy to distribute and to possess with intent to distribute 100 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846. He was subsequently charged by the Grand Jury in an indictment with one count of conspiracy to possess with intent to distribute and to distribute 1,000 kilograms or more of marijuana in violation of 21 U.S.C. § 846. See Docket Entry No. 21.

A preliminary hearing and hearing on the government's motion for detention were both scheduled on March 22, 2013, but, before any proof was presented, the defendant waived his right to a preliminary hearing, and he was bound over to the Grand Jury. Although counsel for the government argued that the defendant faced a rebuttable presumption in favor of detention because he was charged with an offense for which the maximum sentence is ten years or more under the Controlled Substances Act and because the defendant waived his right to a hearing on probable cause, defendant's counsel did not agree that probable cause had been established sufficient to invoke the rebuttable presumption provided in 18 U.S.C. § 3142(e)(3). Nevertheless, the defendant

proceeded to produce witnesses to testify on his behalf. Specifically, the defendant called Courtney Stinson, Angel Foster, Candi Ramer, and Dianna Dale to testify on behalf of the defendant, and Special Agent John Welch with the Bureau of Alcohol, Firearms, Tobacco and Explosives ("ATF") testified on behalf of the government, and the government introduced one collective exhibit.

Ms. Stinson, age 25, testified that she lives in Ashland City, is employed at St. Thomas as a medical assistant, and will be returning to Nashville State where she has been enrolled for one year studying to be a registered nurse. She related that she has known the defendant for four years and has a nine month old son with the defendant. According to Ms. Stinson, the defendant helps her financially with her son, takes him on a regular basis, is a good dad, and is devoted to his son. She testified that she needs the defendant's support and that the defendant would not flee because he would want to remain with his son. She related that, when they began their relationship in 2009, she lived with the defendant and his father for about one year in an apartment, during which time the defendant worked at Druid Tree Service with his uncle Troy Fuller. Although she and the defendant are no longer dating, she described their relationship as amicable and close.

On cross examination, Ms. Stinson denied any knowledge of the defendant's selling marijuana. She explained that the money that the defendant provides her to help support their son comes from the Cirak Club, which is owned by his father, Paul Eichel. She testified that January 28, 2013, was her birthday and the defendant had agreed to babysit with their son. She further testified that the defendant's girlfriend had been harassing him and he was staying in a hotel room to avoid her. She reported that between 9:00 and 9:30 p.m., she dropped her son off with the defendant at the hotel room, but she denied knowing that the defendant had sold marijuana from the hotel room. On redirect, Ms. Stinson testified that it was about 10:00 p.m. when she dropped her son off, and that she saw nothing indicating that the defendant was involved in any drug transaction.

Ms. Foster testified that she is retired from the retailing business and from being a private investigator and her husband has a company that sells labels to hospitals and other businesses. She related that the defendant is her nephew whom she has known all her life and that, in 2008-2009, the defendant stayed with her while on furloughs from the halfway house, after her living arrangements

2

had been approved by Probation Officer Dawn Eastes, and that, since that time, she has had "pretty regular contact" with the defendant, although she was ill for a period of time during which she did not have as much contact with him. She opined that the defendant would not be a danger to anyone nor would he flee because he would not leave his son and other family members. She described the defendant's family as always having been "tight" and "loving." She characterized the defendant's relationship with his son as loving and caring, and indicated that the defendant worships his son. She explained that the family includes Dianna Dale, her mother and the defendant's grandmother, his mother, his father, his first cousin and her husband, and nieces and nephews. Ms. Foster expressed her willingness to serve as the defendant's third party custodian and agreed that the defendant could live with her in her three bedroom, 2800 square foot home in Hendersonville.

On cross examination, Ms. Foster clarified that her sister is the defendant's mother. Although she agreed that drug dealers are dangerous "to a certain point," she testified that she had not seen "that side of" the defendant since she knows him to be only kind and loving. In response to a question of whether her opinion of the defendant would change if she knew that he had confessed to being a leader of a large organization involved in selling hundreds of pounds of marijuana in Nashville, Ms. Foster described the defendant as immature and responded that she would have to know more about the "circumstances" and would have a hard time believing that the defendant was involved in selling drugs. She testified that she understood that the defendant bought and sold cars for a living.

Ms. Ramer testified that she is the defendant's cousin, and that she had lived in New York most of her life until she and her husband closed their restaurant and moved to Nashville the beginning of February of 2013, in hopes of opening a sports bar and grill. She and her husband moved into the defendant's condominium in Cool Springs when the defendant was arrested. She expressed her willingness to be the defendant's third party custodian, along with her husband. On cross examination, she testified that the defendant had told her that he sells cars for a living.

Ms. Dale testified that she is the defendant's grandmother. She described the defendant as having been and remaining immature because his "maturity was cut short" by his incarceration. She

explained that the defendant was "set up" because the authorities really wanted his father, Paul Eichel, to disclose where Perry March's wife was buried although the defendant's father did not know where she was buried.

Ms. Dale related that the defendant has previously worked for Druid Tree Service with her 41 year old son Troy Fuller. She explained that her son left Druid and has started his own tree and landscaping business and is willing to give the defendant a job landscaping. She acknowledged being aware of the defendant's recent travel to Oregon and Hawaii. She opined that the defendant would not flee and that he is not violent and would not otherwise be a danger to the community. She reported having seen the defendant interact with his son, making it clear to her how much he loves his child. Ms. Dale asked if she could trade "Paul for Josh," a reference to the fact that Ms. Dale serves as third party custodian for the defendant's father, Paul Eichel. See Docket Entry No. 12 in United States v. Paul Eichel, 3-12-00220.

On cross examination, Ms. Dale reported that Paul Eichel has done well on pretrial release and that no young girls have visited except her granddaughter. She explained that she was only aware that her grandson had gone to Oregon on one occasion recently with Joey Slate.

Agent Welch testified that he has participated in the investigation in this case, including surveillance, recovery of a shipment of drugs in Kentucky, and the arrest and search of the defendant's residence. He recounted a controlled purchase in October 2012, when a confidential source ("CS") purchased one pound of marijuana from Troy Lee and the CS gave the purchase money to the defendant. Troy Lee was not named as a defendant in the criminal complaint but is named as a co-defendant in the indictment. According to Agent Welch, the defendant told the CS that, if he bought 15 or more pounds of marijuana, he would be given a discount. The second purchase described by Agent Welch occurred on January 28, 2013, in a hotel in Nashville. According to officers who conducted the surveillance of the hotel room, they observed Ms. Stinson arrive and leave her baby and thereafter Sloane Tarver purchased marijuana from the defendant with the defendant's nine month old son present. Sloane Tarver is now a co-defendant in this case, although he was not originally named in the criminal complaint.

4

Agent Welch testified that Mr. Tarver reported that he had been purchasing marijuana from the defendant for several months and, most recently, the defendant had gotten the marijuana from Oregon. Agent Welch related that surveillance had been conducted in Medford, Oregon, where he had seen the defendant with co-defendants J.R. Russell and Terry Jordan. He testified that packages sent from Oregon to Nashville had been intercepted, the latest of which on February 16, 2013, which was mailed by co-defendants Russell and Jordan. A search of that package revealed 10-12 pounds of marijuana in several individually vacuum sealed packages in a ottoman. Agent Welch indicated that three other packages were identified as mailed from Oregon, but they were not intercepted. Agent Welch testified that co-defendant Jordan picked up one of the packages mailed from Oregon.

According to Agent Welch, another package was mailed from Oregon and addressed to Clifford Jones at a Best Western in Louisville, Kentucky, and Mr. Jones picked up the package on March 13, 2013, at the Best Western, where co-defendant Loren Vinett had reserved a room. According to Agent Welch, Ms. Jones had Ms. Vinett's credit card in his possession.[1] Mr. Jones left in a white Suburban with Oregon license plates, which was stopped by the Kentucky state police. A box was found in the car, in which an ottoman contained sealed packages of approximately ten pounds of marijuana. According to Agent Welch, the defendant and co-defendants Jordan and Russell had been observed in Oregon in the same white Suburban. Agent Welch testified that Mr. Jones related that the defendant had offered him $250.00 to get the package in Kentucky and transport it to the defendant in Franklin, Tennessee. Mr. Jones reportedly acknowledged that he had been in the defendant's residence the day before on March 12, 2013, and had observed numerous ottomans, some of which still contained marijuana.

Agent Welch testified that he was present during a search of the defendant's home on March 13, 2013, which revealed approximately $21,000.00 in a safe in bundles of $2000.00 each,

---

[1]    Agent Welch testified that, in December of 2011, packages were sent to co-defendant Vinett from California, and a third package was intercepted in January of 2012, revealing an ottoman containing vacuum sealed packages of marijuana.

ledgers and documents relating to drug trafficking, a small amount of marijuana and cocaine,[2] and three ottomans, which seemed to resemble the ottomans in the packages previously seized. The defendant was arrested in a Range Rover, in which food storage bags and a vacuum sealer, consistent with packaging of marijuana, were located.

Agent Welch reported that, after his arrest, the defendant had admitted to other agents that he had been involved in marijuana distribution since 2011, that he was the "top hydroponic marijuana dealer" in Nashville, and that he had most recently obtained marijuana from Oregon with help from co-defendants Jordan and Russell. Before he obtained marijuana from Oregon, Agent Welch reported that the defendant described his earlier source of marijuana as being from "Mexicans." According to Agent Welch, the defendant acknowledged that the largest amount he purchased at any one time was 86 pounds in Oregon, which cost $100,000.00 to $150,000.00 in cash, and the defendant explained that, if the marijuana was not already packaged, he would package it in ottomans that he purchased from Big Lots for $19.99 a piece. Agent Welch testified that the defendant had named Mr. Tarver as his biggest marijuana customer, purchasing up to 20-30 pounds a week. According to Agent Welch, co-defendant Vinett would travel to other locations to pick up packages, and she was scheduled to pick up a package in Alabama on March 14, 2013, the day after the defendant's arrest, but law enforcement retrieved it pursuant to a search warrant. The package was mailed from Medford, Oregon and addressed to co-defendant Vinett at a LaQuinta Inn in Huntsville, Alabama, and contained an ottoman, which was similar to the ottoman seized from Mr. Jones in Kentucky and to those found in the defendant's home, containing ten packages of marijuana. See Government's Collective Exhibit 1.

On cross examination, Agent Welch acknowledged that, when the defendant was arrested, he told agents about the Alabama package that was intercepted the next day, but Agent Welch testified that agents were already aware of it before the defendant told them. Agent Welch further acknowledged that the defendant had said that he could take $100,000 to $150,000 to Oregon to

---

[2] Agent Welch described the amount of cocaine as indicative of personal use, not distribution.

purchase marijuana but Agent Welch indicated that he was not sure whether the defendant made that statement in the context of offering to assist the agents.

Agent Welch confirmed his prior testimony that Ms. Stinson had been observed arriving shortly before Mr. Tarver arrived at the hotel on January 28, 2013, and explained that he had received that information from FBI Task Force Officer Nathan Opie, who was involved in the surveillance of the hotel room.

Defendant's counsel asked Agent Welch the basis of the charge that the defendant had been involved in distribution of 220 pounds, which is equivalent to 100 kilograms, of marijuana and asked Agent Welch to confirm the amount of marijuana in each of the incidents about which he testified, which included one pound during the October 8, 2012, transaction involving the defendant, the CS and Troy Lee; two pounds during Mr. Tarver's January 28, 2013, purchase from the defendant; and ten pounds during the Kentucky March 13, 2013, seizure, for a total of 13 pounds. Agent Welch testified that he believed that there were additional seizures but that he was not the affiant on the affidavit in support of the criminal complaint. He explained that the 220 pound amount was arrived at on the basis of the investigation as a whole, including packages mailed from California to co-defendant Vinett, but that the figure did not include any drug transactions that the defendant acknowledged after his arrest because that information was provided subsequent to the affidavit in support of the criminal complaint.

The Pretrial Services Officer provided the Court and the parties a memorandum and the defendant's updated criminal history, along with the Presentence Report dated August 11, 2003, and the judgment entered November 4, 2003, in United States v. Joshua A. Eichel, 3-02-00187, the Petition filed by his probation officer on February 7, 2011, and the judgment revoking his supervised release entered March 1, 2011.

The defendant's criminal history began in 1993, when the defendant was 11 years old and was charged in Nashville with vandalism and two counts of "Burglary of an Auto." In 1996, the defendant, age 14, was charged in Florida with burglary and grand larceny. Later than year, he was charged in Nashville with theft. He was ordered to complete four hours of community service work

on the theft charge, the disposition of the vandalism and auto burglary charges in Nashville is not known, and the Florida charges are listed as still pending.

In 1997, at age 15, the defendant was charged in Williamson County with burglary of a motor vehicle and theft over $500.00, for which he was sentenced to 48 hours in custody and placed on supervised probation.  In 1998, at age 16, the defendant was arrested multiple times in Williamson County and once in Davidson County for truancy and being unruly, for which he was ordered to attend class daily; driving with a suspended license and violation of a noise ordinance, which was dismissed; a noise violation, for which he was sentenced to time served; contempt of court, for which he was sentenced to time served; truancy for which he was sentenced to time served; a seat belt violation for which he was ordered to complete 25 hours of public service work; a noise ordinance violation and driving with a restricted license, for which he was sentenced to 25 hours of public service work; driving on a suspended license for which he was placed "on initial adjustment for 3 months;" and speeding and a seat belt violation for which he was ordered to pay a $5.00 fine.

In contrast to 1998, the defendant was only charged once in 1999, at age 17, with theft under $500.00.  However, he was ordered to serve three weekends in detention and placed on home detention for six months, but he was released from home detention after approximately two months for "good progress."  In 2000, at age 18, the defendant was charged only once--with driving with a suspended license, which was dismissed.  Similarly, in 2001, the defendant, at age 19, was charged only once--with DUI, and he was sentenced to 11 months and 29 days in custody with all but 48 hours suspended and he was placed on probation for 11 months and 29 days.

In 2002, at age 20, he graduated from minor criminal offenses to being charged in this Court and later convicted upon his guilty plea in 2003, of four counts of distribution of cocaine, and one count of conspiracy to possess with intent to distribute 100 kilograms or more of marijuana.[3]  He was sentenced to 70 months, followed by four years of supervised release.  His term of supervised release began on July 22, 2008.

---

[3] A sixth count, charging the defendant with carrying and possessing a firearm in furtherance of drug trafficking offense was dismissed on motion of the government.

A report of the defendant's noncompliance with the terms of supervised release was provided to the Court on April 29, 2009. Specifically, the Probation Officer reported that the defendant had been arrested for DUI, but recommended that the defendant be allowed the opportunity to complete treatment. By order entered May 1, 2009, the Court agreed that no action should be taken at that time.

On June 2, 2010, the defendant's probation officer filed a petition, charging that the defendant had violated the terms of his supervised release by being arrested for DUI in April of 2009, and thereafter pleading guilty to reckless endangerment for which he was sentenced to 11 months and 29 days, all of which was suspended except ten days, and placed on supervised probation with special conditions for 11 months and 29 days; with failing to notify his probation officer within 72 hours of having been arrested on April 20, 2010, on a probation violation warrant stemming from the April 2009 DUI;[4] by testing positive for cocaine and admitting to using cocaine on May 8, 2010; by associating with individuals involved in criminal activity by purchasing cocaine from and using cocaine with "Tony;" and for failure to follow instructions of the probation officer by frequenting Silverado's, a nightclub owned by his father, when he had previously specifically been directed not to be on the premises. A hearing was held, at which time the defendant admitted the violations as charged, and the terms of his supervised release were modified to require him to pay for his substance abuse treatment and to not appear on the premises of Silverado's.

On February 7, 2011, another petition was submitted by his probation officer, asserting that he violated the terms of his supervised release by being issued two misdemeanor state citations for possession/casual exchange of a controlled substance,[5] by failing to comply with drug testing on four occasions after having tested positive for cocaine in May of 2010, by failing to participate in drug treatment by missing several therapy sessions, and by leaving the Middle District of Tennessee in

---

[4] According to the June 4, 2010, Petition, the probation warrant was issued because he had tested positive for cocaine and alcohol on April 15, 2010, and he had missed an alcohol test.

[5] He was sentenced in October of 2011, to 11 months and 29 days custody on the drug charge, but the sentence was suspended.

August of 2010, to travel to Indiana for his employer, without advance approval of his probation officer. His supervised release was revoked on March 1, 2011, and he was ordered to serve six months with no supervised release thereafter.

In June of 2009, June of 2010, and October of 2010, while on supervised release, the defendant was arrested in Nashville for driving on a suspended license, but both charges were dismissed, and they do not appear to have been part of any petition filed by the Probation Office.

Counsel for the government argued that the defendant should be detained because of his lengthy criminal history and his having previously served time for drug trafficking. According to the government, the defendant returned to dealing drugs in August of 2011, immediately or almost immediately after he was released from custody after completing his six month sentence after his supervised release was revoked.[6] Counsel for the government also emphasized what he described as a significant conspiracy as evidenced by the amount of drugs and money involved, and the evidence showing that the defendant had people working for him, that the conspiracy reflected a level of sophistication, and that the drug trafficking was conducted throughout the country. He also maintained that the defendant did not have legitimate employment since his business was selling drugs. He also suggested that the defendant had a cocaine habit, and that the defendant had resources in California, including a house and several vehicles in California.[7]

Defense counsel maintained that, although the complaint charged the defendant with selling over 100 kilograms of marijuana, there were no facts from which it could be concluded that the defendant was engaged in selling 100 kilograms. According to defendant's counsel, the allegations in the complaint show that there were fewer than 50 kilograms involved so that, if convicted of that amount, he would face only a maximum sentence of five years in prison. Defendant's counsel also

---

[6] For the defendant to have begun participating in the conspiracy as early as August of 2011, as alleged in the indictment, the defendant would have had to have served less than four months of his six month sentence since he did not report for incarceration until May 4, 2011.

[7] Counsel for the government made representations that the defendant had, after his arrest, made statements about his house and vehicles in California, but there was no proof at the hearing to that effect.

pointed out that the defendant had been released on conditions in the first case in this Court as well as when he was charged with violating the terms of his supervised release.[8]  In addition, although the defendant had traveled to Oregon and Hawaii, he had always returned from those trips. Defendant's counsel urged the Court to consider conditions of release, such as home detention, third party custody of his grandmother, aunt and/or cousin, and electronic monitoring.  He pointed out that all four of the defendants' witnesses had testified that the defendant is not a flight risk inasmuch as everything that he has is in Nashville.  He stressed that all of the defendant's family is in Nashville and that he has never failed to appear for any court appearances.

Counsel for the government added that the evidence showing that the defendant was engaged in drug dealing in the presence of his nine month old son further supports the government's position that the defendant would be a danger if released.  He also contended that the defendant was also a risk of flight because of the amount of money he has obtained and/or is able to obtain and because there are co-conspirators in other parts of the country who can help him flee.

The Court found that, even if the presumption in favor of detention applied, the defendant met his burden of production, although the presumption remains a factor to be considered along with the other statutorily enumerated factors in 18 U.S.C. § 3142(g).

The Court found that the proof to support the defendant's risk of flight is not especially compelling inasmuch as he has significant family ties to this community, including especially his nine month old son, and also including his father, his mother, his grandmother, and other extended family members.  He does not have any record of failing to appear nor was there any proof that he had any inclination to flee.

However, based on the proof presented, the Court found, by clear and convincing evidence, that there are no conditions that would be imposed that would reasonably assure that the defendant would not be a danger to the community.  The proof showed that, by his own admission, the defendant is a major player in a significant drug trafficking operation that has included transactions

---

[8]  Although the defendant was released on the 2010 Petition, he was detained on the 2011 Petition, pending the hearing on the Petition.

in California, Oregon, Kentucky, Alabama and Tennessee.  Whether or not the defendant was involved in distribution of 100 kilograms of marijuana--or 1000 kilograms of marijuana as charged in the indictment--may well be important for purposes of determining a potential sentence but it is not a determinative issue for the Court on the issue of detention.  What is determinative is that the amount of drugs was substantial and the operations, as described by Agent Welch, were very sophisticated, and far reaching.  That sort of operation is inherently dangerous.

On a different scale, the defendant's willingness to involve his nine month old son in his drug trafficking conduct is exceedingly dangerous.  The parties dispute whether or not the defendant's son was actually present during the drug transaction.  At a minimum, however, the defendant knew that Ms. Stinson would be dropping her son off and the proof showed that he not only had two pounds of marijuana for sale in the hotel room but that he also knew that Mr. Tarver would be arriving to buy the marijuana.  Thus, whether or not the defendant's child was present during the drug transaction itself, the defendant was apparently indifferent to the possibility that he could have been and that it was dangerous for his son to be with him at all that evening.  While there were no allegations that any of the participants in the alleged conspiracy used or even possessed firearms, it is not unusual for those involved in drug dealing to have firearms at their disposal.  Putting his small child in harm's way reflects, at a minimum, the defendant's bad judgment and, as his grandmother and cousin suggested, his immaturity.  Bad judgment, immaturity, and indifference to obvious danger not only to himself and others involved in drug transactions but also especially to his child do not suggest that the defendant could be trusted to comply with conditions of release.

That conclusion is also supported by the fact that the defendant has already served a substantial sentence for drug trafficking and, upon his release, he violated the terms of his supervised release and served additional time.  It is clear that the defendant has not learned from this past behavior and appears oblivious to the consequences of his actions.  The defendant's criminal history began in 1993, when he was just 11 years old, and he has continued on a path of involvement in the criminal justice system since that time.  Although he was sentenced to 70 months in prison in 2003, and to another six months for violating the conditions of his supervised release in 2011, he was

apparently undeterred, and, according to Agent Welch, the defendant admitted that he had been involved in distribution of marijuana since 2011. Inasmuch as he was sentenced to prison for six months on March 1, 2011, there could not have been much gap between his release from prison and the beginning of his renewed drug trafficking activities. That timing indicates that the defendant had no interest in even attempting to avoid participation in criminal activity.

The defendant's proposed third party custodians would not provide the Court with the reasonable assurance necessary to consider release. The defendant proposed third party custody arrangements with his grandmother, aunt and/or cousin. Ms. Dale, the defendant's grandmother, has her hands full as the third party custodian of the defendant's father, Paul Eichel. She should not be expected to take both the defendant and his father as her charges. In addition, Ms. Dale appeared more realistic in her perspective of Paul Eichel than she did about the defendant. Ms. Dale's testimony about the reason the defendant was charged in the earlier case seems, without more basis, to be a fanciful excuse. It appears that she is inclined to excuse the defendant's behavior rather than be willing to accept that the defendant may well have again become involved in major drug trafficking activity. Ms. Foster also seemed blinded by what she believes the defendant does and does not do, and reluctant to accept at least the possibility that he is engaged in major criminal activity. None of the three proposed third party custodians appeared to understand the seriousness of the charge against the defendant. A third party custodian who is not able to acknowledge the possibility that the defendant may have been involved in significant drug trafficking and who readily develops excuses for the defendant is not a third party custodian who is likely to be objective or realistic in her relationship with the defendant and thus not likely to exert the necessary control over the defendant.

There was insufficient proof presented that either Ms. Dale, Ms. Foster, or Ms. Ramer would be able to monitor and exercise the necessary control over the defendant. Assuming that the defendant, now age 32, is as immature as both Ms. Foster and Ms. Dale described him, he would require a third party custodian who could rein him in from his immature tendencies. However, it appears to the Court that the defendant's conduct stems from more than simple immaturity. He has

shown an unwillingness to comply with the terms of his prior supervised release inasmuch as the first report of noncompliance was filed within a year of his release, the second petition filed approximately 13 months later, and a third petition filed approximately eight months thereafter which resulted in the revocation of the defendant's supervised release and his being sentenced to an additional six months.

There was insufficient proof presented that would reasonably assure the Court that the defendant would listen to or comply with any rules set by Ms. Dale, Ms. Foster, or Ms. Ramer, that he would comply with the conditions imposed by the Court, or that Ms. Dale, Ms. Foster, or Ms. Ramer would be able to control his behavior. Therefore, the Court found that they would not be appropriate third party custodians.

For these reasons, the defendant was detained pending trial or other resolution of this case.

It is so ORDERED.

_____
JULIET GRIFFIN
United States Magistrate Judge